## Case No. 7,370.

JOHNSON v. The ANNE.

[Oliver's Forms (1842) 465.]

District Court, D. Massachusetts. Oct. 12, 1818.[1]

[1] [Reversed in Case No. 412.]

George Manners (consul), for owners of the said vessel.

William Sullivan, for Captain William Bryant, Jr., and Edward Dunnegan, lately mate of the Anne.

Phineas Blair, for libellant.

DAVIS, District Judge. The object of this libel is to recover compensation for the libellant's services in piloting the schooner Anne from Brown's Bank to Boston, under peculiar circumstances, and for the injury alleged to have accrued to the libellant and others, in breaking up the fishing voyage of the schooner Reindeer, to which he belonged, and from which a supply of provisions was furnished to the suffering people on board of the Anne. The suit was commenced against Edward Dunnegan, alleged to have been acting master of the Anne when the libellant's engagement was made, but in reality the mate. It would have been more correct to have named the real master in the first process, but care has been taken that all interested should have full opportunity of being

heard. The British consul had notice of the suit, and has attended in behalf of the master and owners in the different stages of the proceedings. George Manners, consul of his Britannic majesty, claiming in behalf of William Bryant and John Daniel, both of St. Ives, in the county of Cornwall, in Great Britain, owners of the said schooner Anne, aver that the said schooner, on or about the 10th June last, was under contract by charter party to proceed from Cork, in Ireland, to Quebec, and then sailed from Cork for her said port of destination; that afterwards, in the course of her said voyage, the command of the vessel was forcibly taken from the master by the passengers on board, who compelled the master to direct her course for the United States, and obliged the crew to obey his orders; that in this situation, and being in want of provisions, she was met by the schooner Reindeer, to which the libellant belonged; that the provisions furnished from the Reindeer were fully paid for, and all demands satisfied; that said Johnson's (the libellant's) services as pilot were not wanted, nor requested by the captain, but that his agreement was wholly with the passengers, or with Edward Dunnegan, who acted by coercion from the passengers; and, on these agreements, it is concluded that the vessel is not liable for the compensation demanded.

The schooner Anne was chartered by the captain to Thomas Hunt, of Cork, on the 19th May last, for a voyage to Quebec, "to carry as many passengers," says Captain Bryant, "as were by law allowed to go." The expression in the charter-party is: "Such passengers as said charterer may think fit to embark or put on board." On the 10th June the vessel sailed from Cork with about sixty passengers. An additional number were put on board by Hunt, when the vessel was about five leagues from Cork, contrary, as Captain Bryant states, to his remonstrances. On the 19th of June, Captain Bryant put in at Padstow, on the coast of Cornwall, having met with bad weather, and the vessel having sustained some injury in her spars and sails. At Padstow and at St. Ives the requisite repairs were made; the surplus number of passengers, exceeding the limits prescribed by law, were discharged; additional provisions were taken on board; and on the 16th of July the vessel again put to sea. On the 7th August, in latitude 49°, 34', there was a serious occurrence in the voyage, which is thus recorded in the log-book: "At meridian, the passengers, one and all, told the master he must not proceed to Quebec; that to the United States was their agreement, and there they would have the ship proceed; ordered him to his cabin; then threatened to heave the mate overboard, if he did not navigate the ship either to New York, Philadelphia, or Baltimore; therefore, put him to his oath to do the same."

With this account all the evidence substantially corresponds. The mate adds, in his testimony, that, after he had become engaged to navigate the vessel to the United States, the passengers directed him to inform Captain Bryant that he need not confine himself below, but might continue to command the ship, except as to her navigation; meaning, it is presumed, the direction of her course. It appears, also, that the crew were required by the passengers to obey the mate's orders. There are also several entries in the log-book of falling in with British vessels, and that care was taken to prevent the captain from having any communication with them. In about a week after this transaction there began to be some solicitude in regard to provisions. The usual daily allowance was lessened, and from time to time reduced, so that on the 10th September, when the Reindeer was spoken with, the persons on board the Anne had only one day's supply of bread, and no other provisions. Dunnegan went on board the Reindeer, to procure provisions and a man to pilot them to some convenient port in the United States. He fortunately succeeded in both objects. The provisions, which were promptly furnished, were paid for at a high price. Johnson, the libellant, was willing to pilot the Anne to Portland or Boston for $2 for each person on board, but at length consented to do it for half that sum. He took charge of the vessel, and arrived with her at Boston, three days afterwards; Captain Bryant, whom he consulted, preferring to come to Boston, rather than to go to Portland. The libellant applied to the passengers for his compensation, but was unable to obtain it, and now, by this process, resorts to the vessel, which, it is contended on his behalf, is liable, under the circumstances of the case, for the payment.

It has been said for the respondent that the libellant's services were not necessary. This cannot, I think, be admitted. The carpenter of the Anne, who expresses this opinion, says that the weather was thick and foggy; and Dunnegan, who was out in his reckoning two hundred miles, could not be entirely relied on; and after such a long, anxious, and, for a time, distressing voyage, it must have been a great relief to have a person on board who was well acquainted with the coast, and in whom they could have confidence. There appears to me reason to infer from the evidence that Captain Bryant had this feeling, in common with the passengers. It is true, he makes no agreement with the pilot; tells him he has been deprived of the command of the vessel, and refers him to the passengers. But there are, I think, several indications that he wished him not to leave the vessel; and, though one of the crew testifies that he heard the captain say he did not want a pilot, in this remark he stands unsupported. The captain

himself does not say this in his affidavit. He does, indeed, now declare that he did not wish for a pilot; but it does not appear that he made a communication of this sort to Johnson, when conversing with him on the subject. Several witnesses testify that Captain Bryant requested some of the passengers, by all means, not to let the pilot go away; others, whose situation appears to have been less favorable to know what took place, heard no such request. If we should lay this part of the evidence out of the case, there would still remain a sufficient number of circumstances, the evidence of which is not disputed, to manifest Captain Bryant's disposition to have the pilot retained, though he avoided any direct engagement of his services. Isabella Dola, whose deposition is offered by the consul, says the captain observed to Johnson that the passengers were able, and he hoped he would get his fees of them; he also interposed to quiet the tumultuous noises made by the passengers, from an apprehension that Johnson would be disgusted or alarmed, and would decline to remain; and when Johnson, at length, consented to stay, but made it a condition that they should take more provision from the Reindeer, and a second subscription was opened for that purpose, Captain Bryant was a subscriber, to a small amount, indeed, but three times more than was subscribed by any other person.

In regard to the first subscription for provisions, it was purely from necessity, and on account of the privation which they all experienced from their scanty allowance; but the second subscription must, I think, be connected with Johnson's offer, and as indicating a wish that he should be retained. But it is said that this vessel was in the hands of mutineers, felonious revolters, and pirates; that Johnson, after he came on board, knew the situation of the vessel; that he ought to have declined the performance of any services which would promote the views of the passengers; and that, if he had so done, the mate could have carried the vessel into a port in Nova Scotia, or the captain might have been relieved by some British vessel.

The ground on which the cause is placed, and the very serious manner in which the considerations to repel the libellant's claim have been urged, demand the attention of the court, and have led to a careful examination of the evidence in regard to the points which have been raised. It cannot but be remarked that there are some strange appearances in the case, which naturally excite a curiosity to find the clue which shall interpret the apparent mystery. With me, however, it is not merely curiosity which prompts to the inquiry. A serious duty imposes the obligation to investigate the true character of this voyage, so far as relates to the points referred to in my determination. In the first place, we find all the passengers, excepting Isabella Dola, contending that they were, according to their original agreement, to be conveyed to the United States, and that they were to be landed at Baltimore or at Philadelphia. This is recorded in the log-book as their declaration. So say Roche, Raleigh and his wife, John McCarthy, and Harvey Hunt and his sister, who were among the passengers, and have testified in the cause. Dunnegan, the mate, though he shipped with the master for Quebec, yet, in conversation, the day before, with Thomas Hunt, the charterer, was told by him that he was to go to the United States. It is apparent, therefore, that Thomas Hunt did agree with these people that they should be conveyed to the United States. Now, if Captain Bryant were not privy to the agreement, and tacitly consenting to a course which would admit of its execution, what is the inference? Would Thomas Hunt deliberately adopt a plan for deceiving a considerable number of his countrymen, together with his own son and daughter, and for exposing them to great inconvenience and severe disappointment, in a concern most interesting to all of them? It would be difficult to believe this of any man. Are we, then, to suppose that, without any concurrence on the part of Captain Bryant, he planned the enterprise, as is suggested by the counsel, of forcibly and feloniously taking the command of the vessel from the commander, and diverting her course from its real destination? Or would he, without any arrangement, knowing his own engagements with the passengers, consent that his son and daughter should embark in a vessel in which, on such a supposition, there must have been great reason to expect an insurrection or some very unpleasant altercation. These difficulties inevitably arise on the ground assumed in the defence, and they are not all that occur. That these passengers, one and all, should deliberately commit the daring offence imputed to them, would seem in no small degree improbable. Still, such offences are known to occur, and we are not to reject conclusions from evidence from mere impressions of improbability. But there would seem peculiar rashness in the enterprise, when we consider the line of British coast to be approached or passed, and the probability of meeting a British cruiser, or some other vessel, competent to restore the captain's authority. Most strange does it appear that men, who had persons of intelligence among them, should have the mate under their entire control, and yet should suffer him to make the strong entries against them which we find in the log-book? Did they not examine the log-book? If they did, could they read what the mate has recorded, without terror? How are these things to be explained? I will say, with

Sir William Scott: "I am not deaf to the fair pretensions of human testimony; but, at the same time, I cannot shut my senses against the ordinary course of human conduct." A view of the British law on the subject of passengers may relieve the cause of its difficulties. Comparing Act 43 Geo. III. c. 56, with 57 Geo. III. c. 157, it appears that foreign vessels are limited to one for every five tons of the vessel's measurement; British vessels, if bound, with passengers, to the United States, are subject to the like regulation; but, if bound to Canada, Nova Scotia, New Brunswick, or to Prince Edward's Island, may receive on board one for every ton and a half. Under such regulations. as the tide of emigration, which sets so strongly west ward, is known to be mainly directed towards the United States, we see a strong inducement for an ostensible destination to some of the places which will admit of the greatest number of passengers, though the real destination may be to the United States. In the present instance, if the Anne had been put up for the United States, she could have taken but fifteen passengers: a difference from the number which she actually had on board of material importance both to the owner and the hirer of the vessel.

A consideration of the evidence, in reference to the clue which the state of the British law on this subject, presents to my mind the most satisfactory explanation of many particulars, which have been testified, some of which have been considered by the consul as false or highly improbable. The case of Isabella Dola may seem to militate with the explanation suggested, and the same may be said of the proceedings, on the part of the passengers, while the Anne was detained in England; but there are considerations by which these circumstances may be reconciled with the suggested plan of the voyage. These appearances, taken in connection with the considerations of an opposite tendency, which the case presents, can, at most, produce only a doubtful state of mind as to the real plan and purpose of the voyage; and the libellant's compensation for his services ought not to be defeated, unless the allegations on which the defence rests be proved beyond a reasonable doubt.

The consul has remarked that there have been repeated instances of the enormities which he considers as characterizing this transaction, and in confirmation of the remark it may be observed that it appears by the log-book of the Anne that a ship was spoken from Ireland, with passengers for St. Andrews; "but now," says the entry, "for New York." In all instances of such description which occur, are we to resort to the belief of actual insurrection, felony, and piracy? Or does not the state of things, in regard to this branch of business, under the existing regulations, admit a more benign interpretation, and point to a course of proceeding, culpable, indeed, as relates to British subjects, but not of the flagrant character which, at first view, may have been presumed.

Under these circumstances, and with reference to this cause I do not think it unreasonable to infer that Captain Bryant was not unwilling to proceed to the United States, when he fell in with the Reindeer, and that the libellant's services, which, it appears to me, were acceptable to him, as well as to the passengers, should be a charge against the vessel. If there were any other considerations necessary to support this result, the general interests of commerce and navigation should be mentioned. The services which were rendered by Johnson were not, indeed, compelled, as has been argued, but they were granted on a request so urgent as could not be resisted without violence to the feelings of humanity. It is not expedient nor just to permit services of this character, rendered bona fide and without culpable participation, to be defeated by equivocal or ambiguous circumstances; and I feel no apprehension that there is a departure from the rules and principles which ought to govern a national tribunal, in sustaining the present demand, to a reasonable extent. I shall limit the compensation by a reference to what was originally considered as satisfactory, as well as to what appears reasonable, and decree to the libellant sixty dollars, in full for his services, with costs. As to the claim which he makes for the breaking up of the voyage of the Reindeer, if there be any ground for salvage or compensation on that score, the claim should come from the master and owners. I shall not sustain it in its present form. There appears, indeed, reason to doubt whether such a demand would have been presented to the court had not the opportunity offered to connect it incidentally with the suit for the libellant's personal services. It will be considered whether it be advisable to insist on a demand of this description. The provisions which were furnished were paid for at a high price. No intimation was given of any additional demand; and whether such demand can now be sustained appears to me by what I can learn from the evidence, to be extremely questionable.